IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

LADONA A. POORE,                )
                                )
                Plaintiff,      )
                                )   Case No. 11-CV-797-JED-TLW
v.                              )
                                )
STANLEY GLANZ,                  )
                                )
                Defendant.      )

# OPINION AND ORDER

Plaintiff, LaDona Poore, asserts civil rights claims under 42 U.S.C. § 1983 against Tulsa County Sheriff Stanley Glanz, in his individual and official capacities. Poore alleges that she was sexually assaulted by a jail detention officer, Seth Bowers, when she was 17 and was an inmate at the David L. Moss Criminal Justice Center, known as the Tulsa County Jail (the "Jail"). The Jail is operated by the Tulsa County Sheriff's Office ("TCSO") and is overseen by Sheriff Glanz. Poore asserts that the sexual assaults were the result of Glanz's failure to provide adequate housing, staffing, and supervision for the area of the medical unit where female juveniles like Poore were housed. Sheriff Glanz seeks summary judgment.[1]

## I.    Background

The following facts are supported by evidence in the record and are construed in a light most favorable to the non-movant, Ms. Poore.

*The Alleged Sexual Assaults*

Ms. Poore was held in the Jail from October 5, 2009 to April 29, 2010. She was 17 years old at the time. As a juvenile female inmate, Poore was held in the Jail's medical unit. There,

---

[1] Seth Bowers was a defendant in this case, but plaintiff's claims against Seth Bowers were previously dismissed.

she alleges that she was sexually assaulted by a male detention officer, Seth Bowers. The sexual abuse was reported shortly after Poore was released from the Jail. There is evidence in the record that Poore did not want to report the misconduct by Bowers while she was in Jail, because she was scared. (Doc. 15 at 9, Depo. p. 84). Poore alleges that, on numerous occasions, beginning in February or March, 2010, Bowers entered her cell and sexually assaulted her. The assaults began with fondling her breasts and vagina, and escalated to Bowers exposing his penis and directing her to "suck it." (Doc. 98-5 at 3). Poore alleges that, sometime after Bowers began making demands for oral sex, his behavior escalated to having forceful and rough sexual intercourse with her, which occurred about five times. (Doc. 98-13 at 6-8, Depo. pp. 138-140). The sexual conduct was uninvited and she was subject to his control and power, because he was the detention officer and she was "stuck." (*Id.* at 10, Depo. p. 143). Bowers demonstrated his control and power over her by taking away privileges, such as turning off the television or denying her a second tray of food. He threatened that, if she reported the sexual contact, they "both [would] be in trouble."[2] (*Id.* at 11, Depo. p. 144).

Glanz argues that Poore's testimony, in which she approximated 10 incidents where Bowers demanded and received oral sex, five instances of unwelcomed, coercive, and rough intercourse, and more than 100 occasions on which Bowers fondled her breasts and vagina, "is simply not credible," because another female juvenile inmate testified that she did not witness the contact. (Doc. 66 at 11 of 34, fn.1). Glanz also points to purported inconsistencies between details of the sexual assaults provided by Poore to Jail investigators and details she provided

---

[2] The information concerning Poore's allegations of sexual assault are taken from her deposition and a report of statements she made during an interview regarding the incidents, which both Poore and Glanz reference in their summary judgment papers. The Court is *not* relying upon Poore's interrogatory responses because, as Sheriff Glanz notes, the interrogatory responses are not verified.

during her deposition in this case. At the summary judgment stage, however, the Court is *not* to make credibility determinations or weigh the evidence. In addition to Poore's own testimony, there is evidence in the record that generally supports Poore's claim that Bowers engaged in improper sexual contact with Poore while she was in the Jail. The Jail's investigation of the allegations of sexual assault revealed other inmate witnesses who saw Bowers enter Poore's cell for lengthy periods of time. According to Christopher Blunt, a Jail inmate trustee who worked in the medical unit, Bowers would enter cells of juvenile females in the north end of the medical unit and stay for 20 minutes, which "happen[ed] every time he work[ed]." (Doc. 98-5 at 2). Another juvenile female inmate, Lindsy Shaver, reported to the investigator that she had observed Bowers touch Poore, grabbing her "butt" and breasts, which "happened every time Bowers worked in medical." (*Id.*). In addition, Glanz admits that TCSO investigators found "credible" Poore's allegations that she had been sexually assaulted by Bowers. (*See* Doc. 104 at 8 of 17, ¶ 19, admitting ¶ 19 of Doc. 98).

During his deposition, Bowers invoked his Fifth Amendment right against self-incrimination when asked whether he had sex or intercourse with Poore or had fondled or touched her in a sexual manner. (Doc. 98-9 at 2-3, Depo. pp. 7-8).

***Sheriff's Recognition of Heightened Risks of Sexual Abuse of Juvenile Females***

In his deposition, Sheriff Glanz recognized that "[r]ates of sexual abuse appear to be much higher for confined youth than they are for adult prisoners," "simply being female is a risk factor," "girls are disproportionately represented among sexual abuse victims," and "youth incarcerated with adults are probably at the highest risk of sexual abuse." (Doc. 98-1 at 7-9, Depo. pp. 24-26).

3

*Housing of Juveniles at the Jail*

The Jail holds both male and female juvenile inmates. From 2005 through the time of Poore's housing at the Jail, female juvenile inmates, like Poore, were held in individual cells in the north wing of the Jail's medical unit. Detention officers who are assigned generally to the entire medical unit are also responsible for the area of the medical unit occupied by the juvenile females. Sheriff Glanz acknowledges that he is responsible to ensure the safety of juveniles placed in his Jail. (Doc. 98-1 at 19, Depo. p. 51).

TCSO has a written policy regarding the housing of youthful offenders. The purposes of the policy are to "identify juveniles that can be housed at the [Jail]" and to "[p]rovide procedures for housing, assignment of employees to juvenile housing, and program development for youthful offenders." (Doc. 98-6 at 1). The policy provides that "[d]irect supervision will be employed in the juvenile housing unit to ensure the safety and security of youthful offenders." (*Id.* at 3). Consistent with this stated goal of ensuring juveniles' safety and security, Glanz testified that "it's proven throughout the years that in a direct supervision jail there are very few assaults on inmates on staff [sic] because the other inmates will protect them." (Doc. 98-1 at 22, Depo. p. 57). While Poore was at the Jail, juvenile males were housed in a pod under such direct supervision, while the "juvenile females [did] *not* live in a unit where there's direct supervision." (*See* Doc. 98-1 at 26, Glanz Depo. p. 64) (emphasis added). Chief Robinette, who was a designated Rule 30(b)(6) witness for the TCSO on certain Jail issues, also testified that "the medical unit is not a direct supervision area." (Doc. 98-3 at 5, Depo. p. 29).

The youthful offender policy also provides that detention officers assigned to work with juveniles in special management units are required to have one year of service with TCSO, assigned to housing. (Doc. 98-6 at 2). Glanz testified that the purpose of requiring the one year

4

of officer experience in housing at the Jail is to make sure that officers in the juvenile unit are "familiar with the policies and procedures of the office," and that "there's been some history of their work experience." (Doc. 98-1 at 23-24, Depo. pp. 61-62). The policy also provides that the juvenile detention officers will receive special training "in the developmental, safety, and other specific needs of youthful offenders." (Doc. 98-6 at 2). Glanz acknowledged that such special training is important so that officers working in jails with juveniles have some understanding of adolescent development, which may also relate to reducing the risks of sexual assault within jails. (Doc. 98-1 at 25-26, Depo. pp. 63-64). Glanz testified that it would be a violation of his policy for officers assigned to work with juvenile females to not have the specialized training, but he did not know whether officers assigned to the medical unit received the specialized juvenile-related training. (*Id.* at 28, Depo. p. 68). Chief Robinette testified that, while officers working in the male juvenile pod were required to have that experience and training, those same requirements were not applied to the detention officers who were assigned to the medical unit and thus oversaw the juvenile female inmates housed in the north wing thereof. (Doc. 98-3 at 4-5 Depo. pp. 24-26).

The Oklahoma Jail Standards include a standard applicable to jails holding juvenile offenders, which provides:

> No staff member shall be permitted to enter a juvenile prisoner living area i.e. past the last locked door, without backup assistance being available from another staff member. At least one (1) staff member shall be of the same sex as the juvenile prisoner except in life endangering situations. Life endangering situations are defined as a suicide attempt, obvious injury or illness, which in the opinion of staff, requires immediate attention. Anytime a decision is made to enter the living area without appropriate backup assistance as defined above, the action shall be documented. Documentation shall show the reason for the decision and a permanent record shall be maintained.

*Okla. Admin. Code* 310:670-7-1. Sheriff Glanz testified that this standard, which is applicable to the Jail, requires that "any cell entry of a juvenile female would require that there be two [detention officers] and one of them has to be female." (Doc. 98-1 at 13-14, Depo. pp. 40-41). He then clarified that the female could be a staff member and not necessarily a detention officer. (*Id.*). Glanz indicated that such a policy relates to the risks of sexual assault to juvenile females. (*Id.*). TCSO policies regarding male staff supervising female inmates permit male detention officers to have "a general supervision of the females." (*Id.* at 13, Depo. p. 40). "If [the female inmates] are housed in an individual unit, [the Jail] will always have a female there that is able to perform certain duties that need to be required or may be required." (*Id.*). Robinette testified that the policy was in place to protect officers and inmates. (Doc. 98-3 at 7, Depo. pp. 54-57).

In reply briefing, Sheriff Glanz asserts that the TCSO youthful offender policy and the Oklahoma Jail Standards did not apply to Poore, because she no longer qualified as a "youthful offender" at the time of the alleged sexual assaults. The record provided by the TCSO is scattered on the issue of the applicability of its youthful offender policy. Glanz recognized that the term "youthful offender" has a technical meaning, but he testified that the policy "governs juveniles whether they are technically a youthful offender or are there for some other reason." (Doc. 98-1 at 23, Depo. p. 61). Robinette testified that the youthful offender policy applies to males, not to females. (Doc. 98-3 at 4-5, Depo. pp. 24-27). Her explanation for the differences between the requirements for detention officers overseeing male and female juveniles – direct supervision of male, but not female, juveniles, special training and experience required of officers in charge of male, but not female, juveniles – was simply that the male juveniles were in a "specialized unit" such that the youthful offender policy applied to them only. (*See id.* at 5, Depo. pp. 26-27). Robinette denied that the female juveniles in the medical unit were in a

6

"specialized management unit," because "they are not the only ones housed in that particular area." (*Id.*).

Whether or not Poore was technically a "youthful offender," it is undisputed that she was 17 years old and was held where female juveniles are housed in the Jail. Regardless of whether plaintiff was technically a "youthful offender," the existence of the policies applicable to juveniles and the recognized reasons for such policies (the safety and security of such inmates) remain relevant to a determination of whether there were obvious risks to Poore to which the Sheriff and TCSO were deliberately indifferent.

### *Frequent Practice of Single-Staffing in the Medical Unit*

Glanz's staffing policy is to require that at least two detention officers be assigned to the medical unit at all times. Sheriff Glanz testified that the reason for the policy is that the medical unit is "a very busy place," and medical staff on the unit is also busy. (Doc. 98-1 at 53-55. Depo. pp. 143-146). However, during the time-frame of Poore's incarceration at the Jail, the medical unit was frequently single staffed. Many times the sole detention officer staffing the entire medical unit was a male. At times, Seth Bowers was the only officer assigned to the medical unit, and "[h]e was free to go back into the area of [the] medical unit where the female juveniles were housed, unattended and unsupervised." (Doc. 98-3 at 13, Depo. pp. 107-108).

Robinette testified that she did not think that it was appropriate to staff the medical unit with a single officer, because the medical unit was "too busy to have only one officer down there and do what's expected of them to be done in the medical unit and be safe," and because it was "[p]erhaps" unsafe for the inmates housed in the medical unit. (Doc. 98-3 at 14, Depo. p. 111). Glanz acknowledged that a detention officer who was interested in doing inappropriate things with juvenile females would have "his best opportunity" to do so if he was assigned in the

7

medical unit alone.  (*See* Doc. 98-1 at 55, Depo. p. 146).  There were no special policies or precautions taken to protect female juveniles like Poore who were housed in the north wing of the medical unit; rather, "the same policies as [were applicable to] everybody else in the medical unit" were intended to be applied.  (Doc. 98-3 at 14, Depo. pp. 112-113).

*"Blind Spots"*

Glanz agrees that, "[b]ecause eliminating blind spots is a key to effective supervision," Jail management should "examine areas ... where sexual abuse has occurred to assess whether physical barriers, inadequate staffing, or lack of monitoring technology may have contributed to its occurrence and to undertake needed improvements."  (Doc. 98-1 at 10, Depo. p. 27).  However, there is no process at the Jail to determine whether there are places within the Jail which are blind spots.  (*Id.* at 56, Depo. p. 152).  Glanz explained that "[t]here's really no blind spots in a direct supervision jail, other than the cells that the people occupy."  (*Id.*).  However, as noted above, he and Robinette acknowledged that there was *not* direct supervision in the north wing of the medical unit where Poore was housed.

Glanz also cites his expert's report as "demonstrat[ing] a fundamental disagreement with Plaintiff's definition of 'blind spot.'"  (Doc. 104 at 6).  In support, Glanz quotes part of his expert's report, in which he supplies his definition of blind spot and states that

> the north wing of the medical unit was not designed as a blind spot.  That is, the staff station at the main desk in medical has direct visual access down the north wing *if the double doors to that wing are open and the cell fronts on that wing would then be visible to a staff member at that desk*.

(*Id.*) (emphasis added).  However, Glanz's quote omits the next two sentences of his expert's report, which directly contradict Glanz's suggestion that the north wing of the medical unit was not a blind spot.  The omitted sentences indicate that the double doors to the north wing of the medical unit were, in practice, *not open*, and there was an additional visual barrier blocking the

8

view of the juvenile females' cells from the medical desk: "However, the main desk in the medical area is a high traffic location. Because it is a high traffic location, and because the North wing was used to house juvenile female inmates, *the double doors were kept closed and the portable screen was used to further block the view from the desk area....*" (Doc. 104-5 at 17) (emphasis added). In fact, Glanz's expert admits that the *female juveniles were isolated from view of the desk in the medical unit*, although he opines that such "visual isolation ... actually worked to deter the kinds of staff misconduct alleged in this complaint." (*Id.* at 17).[3]

Glanz's own expert presents a fact issue as to whether the female juveniles were housed in a known "blind spot" without regard to the risk of sexual assault from an officer whose actions might go undetected because of such visual isolation.[4] In addition, the record contains deposition testimony that Bowers would enter Poore's cell, and he was alone when he did so, without any other staff or nurses around, and no nurses or staff reported such conduct. (*See, e.g.,* Doc. 98-14 at 7; Doc. 98-16 at 9, Depo. p. 21). All of this evidence reveals a genuine issue of fact as to whether or not Poore was housed in a known "blind spot" where a male detention

---

[3] The distortion of the opinion of Glanz's expert as to whether the north wing of the medical unit could normally be viewed from the medical desk was repeated again in the argument section of Glanz's reply brief. (Doc. 104 at 14).

[4] There is other conflicting evidence in the record as to whether the juvenile female cell doors were normally visible from the medical desk. (*E.g., Compare* Doc. 104-1 at 4, Depo. p. 152 [Glanz testified that "so far as the front of the cells where these people were located is easily visible from the hallway by anyone that's there"] and Doc. 98-3 at 14, Depo. p. 113 [Robinette testified that the cell doors were visible from the medical unit desk] *with* Doc. 98-1 at 43 [Glanz testified that "[t]here's doors on the north end and south end of this long hallway ... [b]ut on the north end there's a door - - there's four cells. And just south of the four cells there's a locked door, a door that's normally kept locked"] and *id.* at 47 [Glanz testified that "[i]t would be very difficult other than those four cells in that northern section to communicate with anyone outside of that because of that locked door ... [a]nd it would be difficult to hear that outside of the cells."]). The Court need not determine which is correct, because it must draw all conflicting evidence in favor of plaintiff at this stage.

9

officer had open access to do as he pleased, without fear of being seen directly by any other detention officer or nurse, or on camera.

*Prior Staff on Inmate Incident Involving a Juvenile Girl Housed in the Medical Unit*

Prior to Poore's time in Jail, there was a reported incident in 2008 of a male nurse watching a 15 year old female inmate shower in the medical unit. (Doc. 98-11 at 23-24). Sheriff Glanz would have been made aware of it around the time the incident was reported. (*See* Doc. 98-1 at 50-51, Depo. pp. 132-133). Following the 2008 incident, no changes were made with respect to the supervision of juvenile females at the Jail. (*See id.* at 51, Depo. p. 133). For example, there was no installation of video cameras in response to the 2008 incident. (Doc. 98-3 at 6, Depo. p. 52).[5] And it is undisputed that the medical unit was often single-staffed well after the 2008 incident, and in single-staffing the unit, no consideration was given to whether the officer was male or female. (*See* Doc. 98-3 at 110-111).

*Jail Policies and Procedures*

When booked into the Jail, all inmates receive a pamphlet regarding the prevention and reporting of sexual abuse. That pamphlet provides, in part, that staff on inmate sexual misconduct is prohibited and should be reported. (Doc. 66 at ¶¶ 3-7, which were not disputed by Poore). Inmates also receive an Inmate Handbook, which includes information about how to make requests through the Jail's "kiosk system" and contains information with respect to reporting sexual misconduct to detention personnel. (Doc. 68 at 22-23).

TCSO trains detention officers that sexual misconduct within the Jail, including sexual conduct with inmates, is strictly prohibited. Bowers signed the TCSO Code of Ethics and

---

[5] Video cameras were added years later, although Glanz denied they were added in response to the 2008 incident or any other particular incident, such as the alleged abuse of Ms. Poore.

thereby agreed in writing that he would "never subject an inmate to personal abuse, corporal punishment, personal injury, harassment or damage an inmate's property." (Doc. 77 at 1). The TCSO has a policy prohibiting inmate rape. It provides in part:

> [TCSO] has a zero tolerance standard for the incidence of inmate rape and sex-related offenses and attempts thereof and will make every effort to prevent these incidents. The Sheriff's Office will strictly enforce all federal and state laws regarding inmate sexual misconduct, threats of sexual assault or intimidation by providing clear definitions of prohibited conduct....

(*Id.* at 2). With respect to "staff on inmate offenses," the policy provides that "[d]uring initial training, the Detention Training Unit will advise employees that sexual conduct between staff and detainees, volunteers or contract personnel and detainees, regardless of consensual status, is prohibited and subject to administrative and criminal disciplinary sanctions." (*Id.* at 6). The zero tolerance policy was made known to Jail staff, including Bowers.

### *Jail Sexual Abuse Statistics*

The Jail voluntarily participated in the "National Inmate Survey 2008-09," which compiled statistics regarding the prevalence of sexual victimization in prisons and jails nationwide. Glanz notes that the Jail was commended as one of nine, out of a total of 268 jails surveyed, which were identified as jails with a low rate of any type of sexual victimization. (Doc. 66 at 14-16). In response, Poore provides evidence that the Jail underreported incidents of sexual abuse allegations that were investigated at the Jail. For example, in response to a request for documentation from the Department of Justice Review Panel on Prison Rape (DOJ-RP), Sheriff Glanz sent a letter on March 29, 2011 to the DOJ-RP. (Doc. 98-11). Glanz enclosed written responses to the DOJ-RP's inquiries. (*Id.* at 5-34). The written responses, which were prepared by Robinette, provided that "[w]e have included 2010 in all responses to ensure that complete, accurate, and updated information is presented." (*Id.* at 5). Throughout the document,

11

responses were provided for the year 2010. (*See id.* at 5-34). Yet, on the response regarding investigations of alleged staff on inmate sexual abuse at the Jail in the years 2008, 2009, and 2010, the TCSO reported no instances in 2010 and hence did not provide any information regarding the sexual abuse allegations made in 2010 by Poore or another female juvenile inmate, Lindsy Shaver. (*See id.* at 23-24; *see also* Doc. 98-5). Poore has also provided additional examples of inmate complaints of staff on inmate sexual abuse that were investigated but not reported to the DOJ-RP. (Doc. 98 at 17-18, ¶ 21).[6]

*The Sheriff's Response to Allegations of Staff on Juvenile Inmate Sexual Abuse*

After Glanz learned of the allegations that Bowers had sexually abused juvenile females in the north wing of the medical unit, he did not recall inquiring into any underlying facts. (Doc. 98-1 at 32-34, Depo. pp. 74-75, 77). He further testified:

> Q. And did you ask that question again after the matter had been investigated as to how this happened and how it might be avoided in the future?
>
> A. Yeah. I don't recall specifically. You know, anytime we have an incident in the jail, we always review it and look for ways to prevent it in the future....
>
> Q. BY MR. BULLOCK: Did you ever ask how is this officer ever getting into these juvenile female cells without somebody else being present?
>
> A. No. I never asked that question.
>
> Q. Did you ever ask how can we prevent such things from happening again?

---

[6] Glanz asserts that the TCSO "did not misrepresent facts to the DOJ," because "Robinette inadvertently referenced three years (2008-2010) instead of the two years that were requested (2008-2009)." (Doc. 104 at 8). The referenced deposition testimony cited for that proposition does *not* support it. Also, on its face, the responses provided to the DOJ-RP reflect that the TCSO represented that it was *advertently* including 2010 "in all responses to ensure that complete, accurate, and updated information is provided." (Doc. 98-11). Specific data for 2010 was provided (*id.* at 5-34), except as to staff on inmate sexual abuse, as to which TCSO did not identify any 2010 incidents. It is undisputed that there were at least two complaints of staff on inmate sexual abuse in 2010 – Poore and Shaver – that were reported to and investigated by the Jail, and neither was included.

> A. Yes.
>
> Q. And what were you told?
>
> A. And that's - - what was I told on that specific incident?
>
> Q. Yes. When you asked how can we prevent this type of thing from happening in the future, what were you told?
>
> [objection by Glanz's counsel]
>
> [A.] Just to make people more aware of what's going on in that unit and to always be on guard....
>
> Q. ... My question is, after these events, after you find out that there - - that your investigation has determined that it was credible that a sexual assault of a juvenile female took place in your jail, other than recommending that staff be more attentive, were there any other recommendations for changes to be made to avoid this happening in the future?
>
> A. I can't specifically say that any that I'm aware of were made.

(*Id.* at 34-36, 39-41, Depo. pp. 77, 80-81, 88-91).

## II. Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "By its terms, [the Rule 56] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The Court may not weigh the evidence or credit the evidence of the party seeking summary judgment while ignoring evidence offered by the non-movant. *Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1868 (2014) (per curiam).

### III. Discussion

#### A. Individual Capacity Claim

Poore's Eighth Amendment claim against Glanz in his individual capacity is premised upon a theory of supervisory liability. The Tenth Circuit has recently summarized the standards applicable to such claims:

> As an initial matter, it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment. *See Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008); *see also Ortiz v. Jordan*, ... 131 S. Ct. 884, 892-93 ... (2011). Such a violation occurs where "the official knows of and disregards an excessive risk to inmate health or safety," and there is an affirmative link between the constitutional deprivation and the supervisor's actions. *Tafoya*, 516 F.3d at 916 (quotation omitted); *see also Dodds v. Richardson*, 614 F.3d 1185, 1198, n.6, 1204 (10th Cir. 2010). This "affirmative link" has had three related, indistinct prongs in our case law: "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Dodds*, 614 F.3d at 1195, 1199. We have held that a plaintiff may establish the first prong with evidence that "the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy" that caused the constitutional harm. *Id.* at 1199.

*Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013).

The standard of whether the official knows of and disregards an excessive risk "is subjective, requiring that the official actually be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Tafoya*, 516 F.3d at 916 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). However, "[b]ecause it is difficult, if not impossible, to prove another person's actual state of mind,

14

whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001); *Tafoya*, 516 F.3d at 916 ("a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition."). "[I]f a risk is obvious, so that a reasonable man would realize it, we might well infer that [the prison official] did in fact realize it." *Tafoya*, 516 F.3d at 916 (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

"The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." *Id.* "It does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of assault for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* (citation omitted). A prison official may be considered deliberately indifferent if he has knowledge of a substantial risk of serious harm and fails to take reasonable steps to alleviate that risk. *See id.* "At the summary judgment stage, the requirement of deliberate indifference imposes a burden on the plaintiff to present evidence from which a jury might reasonably infer that the prison official was actually aware of a constitutionally infirm condition." *Tafoya*, 516 F.3d at 922.

Glanz argues that he is entitled to summary judgment on the supervisory liability claim because (1) his written policies and training procedures were "constitutionally sufficient" and did not cause harm to Poore and (2) Poore has not established that Glanz was deliberately indifferent because there is no evidence that he was on notice of a risk that Poore would be sexually

assaulted by a detention officer. (*See* Doc. 66 at 19-26).[7] Drawing the evidence in favor of Poore, the Court determines that a reasonable jury might infer that, notwithstanding his "zero tolerance" policy and training notice to employees that they should not sexually abuse inmates, Sheriff Glanz possessed responsibility for the housing of female juvenile inmates, including Poore, in a location of the Jail under conditions which placed them at substantial risk of sexual abuse from staff. Poore was jailed in the north wing of the medical unit. There is conflicting evidence as to whether the female juveniles' cell doors were even visible to staff at the desk in the medical unit and, even if they were, it is undisputed that the nursing staff was "very busy" with their duties most of the time. There is testimony from multiple witnesses that Bowers did in fact enter Poore's cell, without any other detention officer or staff member present. There were no cameras covering any portion of the north wing of the medical unit at the time.

Glanz agreed that juvenile female inmates were at a heightened risk of sexual abuse in correctional settings. While he recognized that his policy of providing direct supervision of juvenile males was for their safety and security, he was aware that juvenile females were *not* in a direct supervision area of the Jail. The same written policy required at least one year's experience in housing for all detention officers who supervised juvenile inmates in special units, but those requirements were *not* imposed as to officers supervising female juveniles housed in a

---

[7] Sheriff Glanz did not present a qualified immunity analysis in his summary judgment papers. The term qualified immunity is included, in passing, in one reference to a general standard, and is made by reference to a Fifth Circuit authority. (Doc. 66 at 18). There is also not a single reference to qualified immunity in Glanz's reply brief. (*See* Doc. 104). Glanz has simply not provided *any* argument as to whether Poore's rights were violated under law that was clearly established at the time of the alleged sexual assaults in 2010. In any event, as the Tenth Circuit has stated, "*it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment.*" *Keith*, 707 F.3d at 1188 (emphasis added) (citing the court's 2008 *Tafoya* opinion).

wing of the medical unit. "The knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." *Tafoya*, 516 F.3d at 919.

Following the 2008 documented report of a male Jail staff member watching a 15 year old female showering in the medical unit, Glanz could not identify any changes that were made with respect to the supervision of juvenile females at the Jail. And, while he was aware that the juvenile females continued after 2008 to be housed without direct supervision, during Poore's time at the Jail, the busy medical unit was often single-staffed by a male detention officer and no cameras were installed to monitor access to the cells occupied by the juvenile females. Chief Robinette did not think that it was appropriate to staff the medical unit with a single officer, because the medical unit was "too busy to have only one officer down there and do what's expected of them to be done in the medical unit and be safe," and because it was "[p]erhaps" unsafe for the inmates housed in the medical unit. (Doc. 98-3 at 14, Depo. p. 111). Glanz himself acknowledged that a detention officer's "best opportunity" to do inappropriate acts with the juvenile female inmates would be when assigned to the medical unit alone.

From all of the evidence, a jury could infer that (1) the manner in which the juvenile female inmates were housed in the north wing of the medical unit was such that they were at risk of sexual abuse by a staff member, (2) as a result of inadequate staffing, supervision, monitoring, and detention of juvenile females, a detention officer could (and did) enter Poore's cell and do as he pleased with her, uninhibited and undetected by any other officer or staff, (3) the risk of harm was so obvious to the female inmates housed in that manner that Glanz realized it, and (4) Glanz failed to take reasonable steps to alleviate that obvious risk. Thus, "a jury might reasonably infer that [Glanz] was actually aware of a constitutionally infirm condition," which is all that is required to establish deliberate indifference at the summary judgment stage. *See Tafoya*, 516

17

F.3d at 922. Hence, Glanz's motion for summary judgment on the § 1983 claim against him in his individual capacity is **denied**.

B. **Official Capacity Claim**

Poore's § 1983 official capacity claim against Sheriff Glanz is considered to be a claim for liability of the county, and the Court therefore applies municipal liability law to that claim. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165-67, n.14 (1985) (an official capacity "suit is, in all respects other than name, to be treated as a suit against the entity"); *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) (an official capacity claim is the same as a suit against the municipal entity; court therefore referred to suit against county and official capacity suit against sheriff as suit against the county).

A municipality or county may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Thus, to establish municipal liability under § 1983, a plaintiff must show "1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)).

The Tenth Circuit has described several types of actions that may constitute a municipal policy or custom.

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

The same evidence and reasons for denying summary judgment to Glanz on the supervisory liability claim apply to the municipal liability claim. In short, a reasonable jury could infer that Glanz's and TCSO's policy and practice of housing juvenile female inmates in a wing of the medical unit – which was not under direct supervision, had no cameras, and was frequently single-staffed – placed those inmates at a substantial risk of sexual assault by Jail staff. There is a direct causal connection between those municipal policies and practices and the staff on inmate sexual abuse which plaintiff allegedly suffered. The motion for summary judgment on the municipal liability claim is accordingly **denied**.

## IV. Conclusion

For the foregoing reasons, Glanz's Motion for Summary Judgment (Doc. 66) is **denied**. The following schedule shall apply to the remainder of this case:

| | |
|---|---|
| **December 19, 2014** | Parties shall submit final proposed Pretrial Order and Trial Exhibits (2 sets of each party's) |
| **January 13, 2015 at 9:30 a.m.** | Final Pretrial Conference |
| **January 20, 2015 at 9:30 a.m.** | Jury Trial |

SO ORDERED this 29th day of August, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE